# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

RODNEY WILLIAM BELL,

                          Plaintiff,

      -v.-                                                  1:16-CV-55 (BKS/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                          Defendant.

PETER M. MARGOLIUS, ESQ., Attorney for Plaintiff
JOSHUA LENARD KERSHNER, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT and RECOMMENDATION

This matter has been referred to me for Report and Recommendation by the Honorable Brenda K. Sannes, United States District Court Judge pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). This case has proceeded in accordance with General Order 18.

## I. PROCEDURAL HISTORY

On or about September 7, 2012, plaintiff protectively[1] filed an application for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI"), alleging disability beginning September 1, 2009 due to a "Back Disorder (Discogenic &

---

[1] When used in conjunction with an "application" for benefits, the term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. §§ 404.630, 416.340. There are various requirements for this written statement. *Id.* If a proper statement is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a later date. The court notes that the ALJ noted, consistently with most of the documents, that plaintiff's protective filing date was September 7, 2012). (T. 11, 47-48). However, the Field Office Disability report states that plaintiff's protective filing date was December 10, 2012. (T. 132). The discrepancy in the dates is not an issue and does not affect this court's decision.

Degenerative) and Chronic Obstructive Pulmonary Disease ("COPD"). (T. 11, 47-48, 106-118). Both claims were denied initially on March 15, 2013. (T. 11, 47-48). Plaintiff requested a hearing, which was held on May 13, 2014 before Administrative Law Judge ("ALJ") Terrence Farrell, at which plaintiff testified. (T. 27-46). The ALJ denied plaintiff's applications in a decision dated July 24, 2014 (T. 11-20), which became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on November 16, 2015. (T. 1-6).

## II. GENERALLY APPLICABLE LAW

### A. Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner ] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents him from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

### B.  Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

3

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III. FACTS

Defense counsel states that he incorporates the summary of the procedural history and the "statement of facts" in plaintiff's brief, "with the exception of any arguments, inferences, or conclusions. (Def.'s Br. at 2). The court notes that plaintiff's brief does not really outline any of the facts separately from his argument on the merits.[2] (Pl.'s Br. at 1-5). Defense counsel also states that he incorporates the

---

[2] The section of plaintiff's brief entitled "Facts" contains only the procedural history and a summary of the ALJ's decision. (Pl.'s Br. at 1-3).

4

procedural history and facts provided in the ALJ's decision. (*Id.*) Rather than reciting all the medical and testimonial evidence at the outset, the court will discuss the relevant details below, as necessary to address the issues raised by plaintiff.

## IV. THE ALJ's DECISION AND APPEALS COUNCIL REVIEW

After determining that plaintiff met the insured status requirement for DIB benefits through December 31, 2015, the ALJ found at step one of the sequential analysis, that plaintiff had not engaged in substantial gainful activity from September 2, 2009 through the date of the ALJ's decision. (T. 13). At step two, the ALJ found that plaintiff had the following severe impairments: COPD, lumbar spondylosis, degenerative disc disease, history of compression fracture, tobacco use disorder, and scapular stabilizer weakness. (*Id.*) The COPD and the back disorders, including the history of compression fracture were all substantiated by clinical tests, including MRI and x-ray tests of plaintiff's back. (T. 13).

Plaintiff was a smoker, and he was diagnosed with COPD by x-ray in 2008. (*Id.* & T. 211) On February 14, 2013, ventilation testing[3] showed "moderate obstruction." (T. 14 & T. 232-34). Various x-rays and MRI reports showed plaintiff's degenerative disc disease, mild compression deformity, and multilevel facet arthropathy with no spinal stenosis. (T. 14 & T. 206-207 (MRI), 215-16 (x-ray), 218 (x-ray), 231 (x-ray)). One of plaintiff's treating physicians, Dr. Anjum Iqbal, M.D. diagnosed plaintiff with scapular stabilizer weakness. (T. 14 & 295).

The ALJ also considered plaintiff's 2013 abdominal hernia repair, but noted that

---

[3] The ventilation testing was done in conjunction with plaintiff's consultative internal medicine examination. (T. 229).

5

the surgery had "good results," and that there was no evidence of an ongoing problem. (T. 14 & 235-38). The ALJ found that the hernia repair did not meet the durational requirement of the statute and was "non-severe." (T. 14).

At step three of the sequential evaluation, the ALJ found that the severity of plaintiff's impairments did not meet or medically equal the requirements of a Listed Impairment. (T. 14-15). Plaintiff's COPD did not meet Listing 3.02 because his pulmonary function tests did not meet the level required in the listing, and plaintiff had never required hospitalizations secondary to his COPD. (T. 14). The ALJ also found that plaintiff's lumbar spine and shoulder impairments did "not reach the level of severity of any listing" because the record did not contain evidence of any loss of strength, reflexes, or sensation, and plaintiff was able to ambulate without any assistive devices. (T. 15).

At step four of the evaluation, the ALJ found that plaintiff had the RFC to perform a full range of sedentary work. (T. 15). Plaintiff was able to occasionally lift, carry, push, and pull at least ten pounds; and he could frequently lift, carry, push, and pull less than ten pounds. (*Id.*) Plaintiff could sit for six hours, and stand and walk for at least two hours in a regular work day, with "normal breaks." (*Id.*) Plaintiff could occasionally balance, climb, crawl, crouch, stoop, and kneel, but he must avoid "concentrated exposure to respiratory irritants." (*Id.*)

In making the above determination, the ALJ considered the medical evidence as well as plaintiff's subjective complaints. (T. 15-19). The ALJ reviewed the medical evidence from plaintiff's treating physicians and from his treating physician assistants

("PA") – Brianna Fuller and Dina Gage. (T. 17). PA Fuller submitted a very restrictive medical source statement ("MSS"),[4] to which the ALJ gave "no weight." (T. 18). The ALJ found that PA Fuller's medical source statement was contradicted by records from plaintiff's treating orthopedist as well as the consultative examiner Dr. Kautilya Puri, M.D. (T. 18). In addition, the ALJ found that PA Fuller's assessment was "both poorly supported and inconsistent with the medical evidence of record including her own treatment records in Exhibit 8F." (*Id.* & T. 272-94). The ALJ considered plaintiff's allegations of disabling symptoms and found that they were "exaggerated" and were unsupported by his reported history as well as the medical evidence of record. (T. 16-17).

At step four, the ALJ also found that plaintiff was unable to perform any of his past relevant work. (T. 19). However, at step five, the ALJ found that plaintiff could perform a full range of sedentary work, and considering plaintiff's age, education, and prior work experience, there were jobs existing in significant numbers in the national economy that plaintiff could perform. (T. 19-20). In making this determination, the ALJ used the Medical Vocational Guidelines ("the Grids"). (T. 19-20) (20 C.F.R. Pt. 404, Subpt. P, App. 2 §§ 201.25, 201.19).[5]

---

[4] This document is entitled "Medical Source Statement." (T. 307-312). It is essentially a residual functional capacity ("RFC") evaluation, with boxes to "check," representing the medical source's opinion of plaintiff's physical abilities. The court will refer to the document as the MSS because it is so titled.

[5] The ALJ used two sections of the Grid guidelines because, at the time of his application, plaintiff was a "younger individual" 18-44 years old, but during the relevant period, he changed age categories to a "younger individual" 45-49 years old. (T. 19). Both sections directed a finding of "not disabled."

7

Plaintiff submitted additional medical evidence to the Appeals Council. (T. 322-51). All of the medical evidence submitted to the Appeals Council was dated after the ALJ's opinion. (*Id.*) In its review, the Appeals Council considered the evidence, which was dated from July 30, 2014 to December 23, 2014. (T. 2). The Appeals Council noted that the ALJ's decision determined that plaintiff was not disabled through July 24, 2014, and the "new information" related to a "later time" and did "not affect the decision about whether you were disabled beginning on or before July 24, 2014 [the date of the ALJ's decision.]"[6] (*Id.*)

## V. ISSUE IN CONTENTION

Plaintiff advances the following argument:

(1) The RFC assessment is not supported by substantial evidence. (Pl.'s Br. at 3-5).

Defendant argues that the Commissioner's determination is supported by substantial evidence, and that the complaint should be dismissed. (Def.'s Br. at 6-12). For the following reasons, the court agrees with defendant and will recommend dismissal of the complaint.

## VI. RFC/TREATING PHYSICIAN/WEIGHT OF THE EVIDENCE

### 1. Legal Standards

#### a. RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work

---

[6] The court notes that plaintiff does not challenge this determination in his papers, and the court will only discuss the issue briefly below.

activities in an ordinary work setting on a regular and continuing basis. . . ." A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, No. 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7).

### 2. Treating Physician

"Under the treating physician rule, deference is given to the opinions of the physician who has provided the primary treatment for the patient." *Rugless v. Comm'r.*

*of Soc. Sec.*, 548 F. App'x. 698, 699-700 (2d Cir. Dec. 19, 2013). "SSA regulations advise claimants that a treating source's opinion on the issues of the nature and severity of [their] impairments will be given 'controlling weight' if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." *Green Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The ALJ must properly analyze the reasons that a report of a treating physician is rejected. *Halloran v. Barnhart*, 362 F.3d 28, 32-33 (2004). An ALJ may not arbitrarily substitute his own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

### 3. Weight of the Evidence

In making his determination, the ALJ weighs all the evidence of record and carefully considers medical source opinions about any issue. SSR 96-5p, 1996 WL 374183, at *2-3 (1996). Under 20 C.F.R. §§ 404.1527(e) and 416.927(e), some issues are not "medical issues," but are "administrative findings." The responsibility for determining these issues belongs to the Commissioner. SSR 96-5p, 1996 WL 374183, at *2. These issues include whether the plaintiff's impairments meet or equal a listed impairment; the plaintiff's RFC; how the vocational factors apply; and whether the plaintiff is "disabled" under the Act. *Id.* In evaluating medical opinions on issues that are reserved to the Commissioner, the ALJ must apply the factors listed in 20 C.F.R. §§ 404.1527(d) and 416.927(d). The ALJ must clearly state the legal rules that she applies and the weight that she accords the evidence considered. *Drysdale v. Colvin*,

No. 14-CV-722, 2015 WL 3776382, at *2 (S.D.N.Y. June 16, 2015) (citing *Rivera v. Astrue*, No. 10 Civ. 4324, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted)).

### B. Application

Plaintiff argues that the ALJ failed to consider the plaintiff's scapular stabilizer weakness when determining that plaintiff could perform a "full range" of sedentary work. (Pl.'s Br. at 3). Plaintiff claims that his scapular stabilizer weakness prevents him from "frequently" using his upper extremities. (Pl.'s Br. at 4). In support of this assertion, plaintiff cites four pages of the record. (*Id.*) (citing T. 201, 296, 295, and 309). Plaintiff cites to an examination by PA Fuller, dated September 18, 2012 in which plaintiff "complained of pain radiating up to his shoulders." (*Id.*) (citing T. 201). Plaintiff also cites to an August 19, 2013 examination by treating physician Dr. Iqbal, during which plaintiff complained of "pain with lifting and with activities using upper extremities." (*Id.*) (citing T. 296). On February 3, 2014, plaintiff "continued to complain" about his shoulder pain, and Dr. Iqbal "assessed endurance problems with the shoulder scapular stabilizers and decreased endurance due to weakness and recommended the continuation of physical therapy which included core muscle strengthening and shoulder girdle muscle strengthening." (*Id.*) (citing T. 295).

Finally, plaintiff cites the MSS, completed by PA Fuller in which she opined that plaintiff was "limited to occasionally reaching overhead, occasionally reaching in all other directions, and occasionally pushing and/or pulling with his bilateral upper extremities." (*Id.*) (citing T. 309). Plaintiff argues that, although PA Fuller is not an

11

"acceptable medical source" for purpose of the social security regulations, she is entitled to "significant weight" because, according to the regulations, a physician assistant opinion may be "'used to show the severity of your impairment(s) and how it affects your ability to work.'" (*Id.*) (citing 20 C.F.R. §§ 404.1513(d), 416.913(d)). Using PA Fuller's assessment, plaintiff argues that the "additional limitation" of "occasional reaching in all directions with the bilateral extremities significantly erodes the sedentary unskilled work base, and ultimately precludes gainful employment." (*Id.*)

The first problem with plaintiff's argument is that he cites three examinations, during which he "complained" about some shoulder pain, one examination during which Dr. Iqbal stated that plaintiff "assessed endurance problems" and recommended muscle strengthening, and PA Fuller's MSS, which is not supported by any of the treating physicians' reports or the report of the consulting physician, Dr. Puri. In addition, under the regulations, PA Fuller is not an "acceptable medical source," who can "establish" whether plaintiff has a medically determinable impairment. *See* 20 C.F.R. §§ 404.1513(a)(1) & (d)(1); 416.913(a)(1) & (d)(1). Even though her evidence "may" be used to show the severity of plaintiff's impairments and how it affects his ability to work, the operative term in the regulation is "may." 20 C.F.R. §§ 404.1513 (d); 416.913(d). The ALJ is not *required* to accept the findings of a source who is not an "acceptable medical source," particularly where, as here, PA Fuller's MSS is not supported by the evidence submitted by plaintiff's treating physicians, PA Fuller's own contemporaneous medical records, and Dr. Puri's evaluation.[7]

---

[7] The court would also point out that counsel's argument is inconsistent with the regulations and the case law. Social Security Ruling ("SSR") 85-15 states:

The ALJ found that plaintiff had severe impairments, and that plaintiff's impairments could reasonably cause pain. (T. 16). However, the ALJ determined that the medical evidence did not support the extent of plaintiff's allegations of disabling pain. In his August 19, 2013 report, in which Dr. Iqbal assessed scapular stabilizer "weakness," Dr. Iqbal also stated that plaintiff described this pain as an "achy feeling usually with lifting and with activities using upper extremities." (T. 296). In the same report, Dr. Iqbal stated that plaintiff had no problem "sitting, standing, or walking"[8] and recommended home exercises, physical therapy, and strengthening. (T. 296). On February 3, 2014, Dr. Iqbal stated that plaintiff had "no significant discomfort in the neck or low back. Only when doing activities does he feel shoulder *discomfort* in the

---

> Reaching, handling, fingering, and feeling require progressively finer usage of the upper extremities to perform work-related activities. Reaching (extending the hands and arms in any direction) and handling (seizing, holding, grasping, turning or otherwise working primarily with the whole hand or hands) are activities required in almost all jobs. Significant limitations of reaching or handling, therefore, may eliminate a large number of occupations a person could otherwise do. ***Varying degrees of limitations would have different effects, and the assistance of a [Vocational Expert] may be needed to determine the effects of the limitations***.

SSR 85-15, 1985 WL 56857, at *7 (SSA 1985) (emphasis added). This language indicates that "significant" limitations in the ability to reach, handle, finger, and feel may preclude the use of the Grids, and may require a vocational expert at step five to determine whether plaintiff could perform other jobs existing in significant numbers in the national economy. Contrary to plaintiff's assertion, the ability to reach "occasionally" - even if that were true - would not necessarily "ultimately preclude gainful employment." *See Selian v. Astrue,* 708 F.3d 409, 422 (2d Cir. 2013) (Reaching is "required in almost all jobs," and a reaching limitation "may eliminate a large number of occupations a person could otherwise do.") (citing SSR 85-15, 1985 WL 56857, at *7 (Jan. 1, 1985)). Once again, the operative term is "may." In any event, more analysis would have been required in order to determine that substantial gainful employment was "precluded."

[8] This finding is contrary to PA Fuller's MSS, in which she limited plaintiff's sitting, standing, and walking to "15-20 min." each, for a total of three hours sitting, two hours standing, and three hours walking in an eight-hour day. (T. 308).

13

muscles around the trapezius between the shoulder blades." (T. 295) (emphasis added). Plaintiff denied any radiating pain into the upper extremities, lower extremities, or into the chest wall. (*Id.*) He denied any focal weakness, and he had no significant tenderness to palpation in the cervical paravertebrals or shoulder paravertebrals. (*Id.*) Plaintiff also had a *normal* range of motion in his shoulders. Dr. Iqbal recommended strengthening exercises. (*Id.*)

The ALJ gave great weight to the February 14, 2013 examination by consulting physician, Dr. Puri. (T. 18) (citing T. 227-30). Dr. Puri noted that plaintiff's "chief" complaint was his COPD. (T. 227). Dr. Puri noted plaintiff's history of low back pain, which plaintiff described as sharp pain on moving, bending, lifting, twisting, and squatting. (T. 227). However, Dr. Puri's examination showed only generalized decreased range of motion of five to ten degrees in plaintiff's lumbar spine, with some mild local tenderness. (T. 228). Plaintiff had ***full*** range of motion in his shoulders, elbows, forearms, wrists, hips, knees, and ankles. (*Id.*) Plaintiff told Dr. Puri that he had a steroid injection which did not help.[9] However, Dr. Puri's examination showed that plaintiff's gait was normal, he could heel/toe walk without difficulty, could do a full squat, needed no assistance with changing his clothes, and rose from the chair without difficulty.[10] (T. 228).

---

[9] This is contrary to Dr. Iqbal's report, dated January 22, 2013, in which he noted that plaintiff had an epidural steroid injection from which he got "significant relief with no pain on a numerical scale." (T. 226). This contradictory statement from plaintiff was one of the reasons that the ALJ questioned plaintiff's credibility.

[10] At the hearing, plaintiff testified that he needed assistance getting up from a squat and had difficulty rising from a seated position. (T. 42). None of the doctors made this finding, and Dr. Puri specifically stated that plaintiff had no trouble performing either function. (T. 228). While the court

Dr Puri found that plaintiff's deep tendon reflexes were physiologic and equal in the upper and lower extremities, that no sensory deficits were noted, and that plaintiff's strength was "5/5" in the upper and lower extremities with no muscle atrophy. (T. 229). Hand and finger dexterity were intact, and grip strength was 5/5 bilaterally. (*Id.*) Dr. Puri stated that plaintiff "did not have any objective limitations in communication or fine motor or gross motor activity. There were no objective limitations to the claimant's gait or to his activities of daily living today." (*Id.*) Dr. Puri's ultimate recommendation was that plaintiff avoid "heavy" lifting and stay away from respiratory irritants because of his COPD. (*Id.*) There were no noted restrictions to plaintiff's ability to reach in any direction.

On November 3, 2010, plaintiff's primary care physician, Dr. Samuel Merkhan, M.D. stated that plaintiff experienced moderate lumbosacral tenderness to palpation at the L1-L3 levels with a moderate reduction in lumbar spine flexion bilaterally, with paraspinal muscle spasm present. (T. 254). However, the strength in both lower extremities was normal. (*Id.*)

On September 18, 2012, PA Fuller found tenderness to palpation in plaintiff's lumbar region and moderately reduced range of motion in the lumbar spine, but his paraspinal muscle strength and tone were within normal limits, and his lower extremities had normal range of motion and strength. (T. 203-204). Plaintiff did not complain about shoulder pain or any problem reaching at that time. In PA Fuller's

---

notes that plaintiff's hearing was in May of 2014, and plaintiff testified that he was getting "worse," the ALJ evaluated the medical evidence of record to make his determination, and the ALJ's determination is supported by substantial evidence in the record.

15

review of systems, under "Musculoskeletal," PA Fuller wrote: "Admits: back pain[,] Denies: joint pain, joint swelling, muscle pain, [or] muscle cramps." (T. 202). Plaintiff also denied any transient weakness, numbness of visual disturbance, tingling or numbness." (*Id.*) PA Fuller stated that plaintiff had "normal gait, [was] able to stand without difficulty, and [was] able to participate in exercise program." (T. 204).

By December 5, 2012, PA Gage reported that plaintiff had no spinal tenderness, and the range of motion in his spine was "normal." (T. 193). Both upper and lower extremities had "normal" range of motion. (*Id.*) Shoulder, elbow, and wrist stability were normal bilaterally. (*Id.*) Plaintiff's gait was normal, and he was able to stand without difficulty. (*Id.*)

PA Fuller's MSS was dated May 16, 2014. (T. 307-312). There appears to be no contemporaneous examination by PA Fuller on that date or immediately preceding that date. However, on July 8, 2014, Dr. Ersno Eromo, M.D.[11] examined plaintiff for his "moderate-severe" back pain as a follow up to plaintiff's updated MRI. (T. 313). Plaintiff reported that his pain radiated into the medial spine and into the shoulders. (*Id.*) Plaintiff told Dr. Eromo that he had problems for "years," but it had "been getting worse in the past few months." (*Id.*) Plaintiff had an updated MRI on June 27, 2014. Plaintiff claimed that he was having back pain that radiated into the left leg with numbness and weakness at a level of 5/10. (*Id.*)

Notwithstanding plaintiff's allegations, Dr. Eromo found full range of motion on flexion, extension, lateral bending, and lateral rotation of the neck, with no pain. (*Id.*)

---

[11] Dr. Eromo is a physician at the "Spine Institute of Columbia Memorial Hospital." (T. 313).

Plaintiff had normal heel-toe gait and could heel/toe walk without difficulty. He had a full range of motion in the shoulders, elbows, wrists and forearms bilaterally. He had no tenderness in the cervical, thoracic, or lumbar spine. He strength, sensation, reflexes, and coordination were normal. (T. 314). The neurological examination of his shoulders, biceps, triceps, brachioradialis, interossei and lumbricals was 5/5 bilaterally. (*Id.*) Dr. Eromo noted that plaintiff continued to report pain of "moderate" intensity, which although axial in nature, was intermittently accompanied by subjective weakness of the left lower extremity.[12] "Upon examination, however, no neurologic deficit is noted." (*Id.*) Dr. Eromo's finding that plaintiff had full range of motion of the shoulders is contrary to plaintiff's claim that his "reaching" is limited.

The ALJ compensated for any weakness alleged by plaintiff by limiting him to sedentary work where he would not have to lift, carry, push, or pull more than ten pounds occasionally and correctly noted that PA Fuller's medical source statement was not consistent with the medical evidence in the record, placing more weight on plaintiff's treating physicians and on Dr. Puri, the consultative physician. There is no objective evidence in the record that plaintiff can only "occasionally" reach in any direction.[13] The ALJ's decision to give PA Fuller's MSS no weight is supported by

---

[12] "Axial" or "mechanical" back pain is localized and confined to the low back area, which does not travel to the buttock, legs, and feet. http://www.spine-health.com/conditions/lower-back-pain/axial-back-pain-most-common-low-back-pain. Radicular pain is secondary to compression or inflamation of a spinal nerve. http://www.spine-health.com/conditions/lower-back-pain/lumbar-radiculopathy. Although plaintiff complained of "subjective" weakness in the lower extremity, his MRI showed that there was no spinal stenosis, notwithstanding a narrowing of the neural foramina. (T. 207 (2010 MRI), 320 (2014 MRI) ("no central canal stenosis or focal herniation")).

[13] As stated above, plaintiff submitted medical records which are dated after the ALJ's decision, and the Appeals Council decided that these records would not affect the ALJ's decision and informed

17

substantial evidence. Thus, the ALJ's determination that plaintiff can perform the full range of sedentary work is also supported by substantial evidence, and the Commissioner's decision should be affirmed.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the Commissioner's decision be **AFFIRMED**, and plaintiff's complaint be **DISMISSED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: March 2, 2017

*[signature]*
Hon. Andrew T. Baxter
U.S. Magistrate Judge

---

plaintiff that he could reapply with a new onset date if his condition had gotten worse. The plaintiff does not challenge the Appeals Council's finding. The court notes that in July of 2014, the plaintiff stated to Dr. Eromo that he always had back problems, but they had gotten worse "in the last few months." (T. 313). The fact that plaintiff admitted that his pain was getting worse shows that the newer medical records, to the extent that they demonstrate greater limitations, are not relevant to the time period in question.